

# ARKANSAS COURT OF APPEALS

DIVISION II
**No.** CV-16-975

| | |
|---|---|
| U.S. CURRENCY IN THE AMOUNT OF $31,418.00 AND NATHAN STEVENS<br><br>APPELLANTS<br><br>V.<br><br>STATE OF ARKANSAS<br>APPELLEE | **Opinion Delivered:** June 7, 2017<br><br>APPEAL FROM THE LONOKE COUNTY CIRCUIT COURT [NO. 43CV-15-236]<br><br>HONORABLE BARBARA ELMORE, JUDGE<br><br>AFFIRMED |

## WAYMOND M. BROWN, Judge

Nathan Stevens appeals from the circuit court's forfeiture of $31,418 found in his possession during a traffic stop. On appeal, Stevens argues that (1) appellee failed to make a causal connection between the money hidden in the vehicle and drug trafficking or sales, and that (2) Arkansas Code Annotated section 5-64-505[1] is ambiguous and contradictory and does not support the seizure of property where the underlying crime is a misdemeanor possession of a controlled substance. We affirm.

On May 14, 2015, appellee filed an in-rem complaint pursuant to the provisions of Arkansas Code Annotated section 5-64-505, requesting forfeiture of money seized from appellant's vehicle on April 18, 2015. On July 28, 2015, appellant filed an answer and countercomplaint for writ of replevin and argued that, because he was convicted of a

---

[1](Supp. 2011).

SLIP OPINION

misdemeanor possession charge, the seizure was unlawful.[2] The circuit court held a forfeiture hearing on July 25, 2015.

Sergeant Farris McClain of the Carlisle Police Department testified to going out to a local Exxon on the afternoon of April 18, 2015, to attempt to unlock a vehicle. A female, Brandi Scruggs, reported to him that she had locked her keys in the vehicle and led him to a gray 2014 Ford Escape. After several minutes of unsuccessfully attempting to unlock the door, two other officers—Dan Hogan and Robert Wakefield—arrived on the scene to assist McClain. When McClain asked Scruggs what business she rented the car from, she initially said Enterprise; however, Hogan's search of the license plate revealed that the vehicle belonged to a Hertz Rental out of California. McClain asked Scruggs who rented the vehicle and she mentioned "some girl named 'Carrie' she really didn't know"; "a friend of a friend." McClain reported that Scruggs was "acting a little bit nervous at the time." After "several more minutes[,]" McClain was able to gain entry to the vehicle. He retrieved the vehicle's keys and the rental contract. The contract did not reflect Scruggs' name nor a "Carrie" but another individual named Candice Spain who was "out of Kentucky" and was not in nor around the vehicle.

About the time of this discovery, a male individual walked up and identified himself as "David Carneal" with a date of birth of July 1, 1982. McClain was unable to get a return in the Arkansas Criminal Information Center terminal on that name and date of birth. From the stand, McClain identified appellant as "David Carneal." He then asked "Carneal" for

---

[2]Appellant had also filed a pro se answer on July 10, 2015.

his identification, which he was unable to provide. When asked their destination during what McClain described as "somewhat" of a field interview, with the two parties separated, Scruggs replied with Oklahoma while "Carneal" replied with Arizona. "Carneal" was acting "very nervous" and McClain could detect a "strong odor" of alcohol on his person. McClain then confronted "Carneal" on whether he had been drinking and "Carneal" admitted that he had earlier. When asked who rented the vehicle, "Carneal" identified "an old friend named Carrie"—"[s]omebody named Carrie"—though he could not give a last name. During their investigation, McClain "looked around, and [appellant] had left the scene"; had "walked away" and "just disappeared."[3]

When McClain determined from the contract that the car was a Hertz rental and not an Enterprise rental, Hogan contacted Hertz, which advised them to seize the car since neither Scruggs nor "Carneal" was on the contract. McClain asked Scruggs and "Carneal" if they had anything illegal in the vehicle, to which they each replied no. Prior to the inventory search, and pursuant to the seizure requested by Hertz, Wakefield ran a K-9 sniff that alerted for narcotics. The officers then conducted a "full-on search." Numerous items were found therein; of pertinence, a small bag of "green-leafy substance suspected [and later confirmed] to be marijuana[,]" a half-smoked marijuana cigarette, and money. Upon locating the money, Scruggs and "Carneal" were advised that they were under arrest for three misdemeanor charges;[4] "Carneal" admitted the marijuana belonged to him at that

_____

[3]There was no testimony regarding whether "Carneal" returned on his own or if the officers went in search of him.

[4]Appellant was charged with possession of marijuana, misdemeanor obstructing operations, and misdemeanor possession, all Class A misdemeanor charges.

time. The car was inventoried and towed to an impound lot, and Scruggs and "Carneal" were taken to the police department, after which an "extended" search was conducted on the vehicle at the impound lot. Regarding the money found during that search, McClain testified as follows:

> And during this time we found a large quantity of money. It was in three or four different places. In the back cargo area, there was [sic] storage pockets back there in both pockets. While I'm looking through there, there was some glue. I can't remember exactly. I think it was in the back seat. But while we were looking and inspecting the vehicle at that time, I see glue around the center console, the gearshift. At that point we was [sic] able to gain entry, and there was another large amount of marijuana there. I mean—I'm sorry—a large amount of money. No other marijuana was found in the vehicle. The money is just what I found prior to being impounded. The money was found underneath. You just pull this cover up, and I believe the glove compartment contained a large quantity of money. We took it to First State Bank, and they determined it was $31,418 in cash.

After "about a two hour period[,]" "Carneal" finally revealed his true identity as Nathan Stevens and gave his correct date of birth, which McClain confirmed. McClain never told Stevens that he had found the money, and Stevens "never said anything about, 'I've got some money in my car.'" Stevens never spoke of the large amount of money, only the money in his wallet. A confiscation report was prepared and forwarded to the prosecutor's office. McClain admitted that his seizures "typically . . . involved felony amount [sic] of drugs along with some cash"; however, the "large amount in these various places concealed with their demeanor led [him] to believe the money was used for drugs." This was in addition to Stevens's failure to even tell him that the money was in the vehicle. He testified that he believed the money was used for drug trafficking, buying or selling drugs, and that was why he seized it.

Wakefield testified to assisting McClain with the locked-car situation involving Scruggs and Stevens.[5] He stated that Scruggs was acting nervous at the time, and "didn't act like she just had a locked vehicle"; she acted like "something further was going on." He stated that Stevens went through two different names before correctly identifying himself.[6] Stevens denied any knowledge of any of the money outside of the "roughly" $1,500 in his wallet.

Corporal Vic Coleman, of the Arkansas State Police's Interstate Criminal Patrol Unit, testified that his unit does criminal interdiction, which includes drug interdiction. Noting that he had looked at the facts of this particular case, read the report, and viewed the video, Coleman was permitted to testify as an expert without objection. He testified that his expertise was in land-based trafficking, noting that the "great majority of narcotics that travel into the United States cross the Mexican border, the southwest quarter from Mexico to the United States through California, Texas, Arizona, Mexico." He stated that drugs traditionally moved east along I-40 going to major cities in the east and money traditionally is travelling westbound "back to the border back into Mexico." He testified that in a lot of these drug cases, the parties will have conflicting stories, like when Scruggs stated that she and Stevens were heading to Oklahoma while Stevens stated that they were headed to Arizona.

---

[5]Wakefield was present when Stevens was arrested and when the money was found in the vehicle.

[6]Stevens also identified himself as Brandon Henderson. Hogan also testified, but his testimony was duplicative of McClain's and Wakefield's testimony.

Coleman had consistently seen in his history, a third-party rental, as in this case where neither Scruggs nor Stevens knew who rented the vehicle and "didn't know each other very well, apparently." Coleman stated that this was because "they don't want to lose their personal vehicle if it is seized."[7] However, he admitted that just being in a rental car "would not mean anything to [him]." Coleman stated that the "guy who owns the money, he doesn't want to be where the money's at, so he rents a vehicle and gives a third party the money and the vehicle and says, 'Go to point A.'"

What "jumped out at [Coleman]" were the facts that Stevens and Scruggs were headed to Arizona because it is a "source area for narcotics" as recognized by the DEA, the individuals were nervous, they were deceptive, and neither party claimed the money. The fact that very little drugs were found did not "mean anything to [Coleman] one way or another" because you traditionally "don't see a lot of drugs in a vehicle" and it was actually "uncommon to find drugs in the vehicle at all" because "they don't want the drugs and the money in the same place." But he admitted that he had had cases in which there were drugs and money. An individual's lack of criminal history could go both ways, having no criminal history, or a lot of history. Coleman found it to be suspect that the money was found in different locations. He opined that "$30,000 is a lot of money for anybody to have on you" and noted that he would not seize $5,000 or $10,000 "[w]ithout other indicators." His opinion was that the money in this case was "destined to be used in exchange for drugs."

---

[7]"They" were not identified, but appears to refer to drug dealers.

During appellant's counsel's cross-examination, she stated that she was "confused on that as to what [Coleman's] role here is[,]" to which the circuit court responded "[a]s an expert witness. That was it. He didn't say he was involved in any of it or anything else. And you said it was okay for him to be a witness." After explaining her belief that Coleman had some role in the case, to which the circuit court responded that he had not, appellant's counsel stated that she had no questions of Coleman.

Stevens then testified that he lives in Kentucky and "got a ride from this person [presumably Scruggs]" to go see his dad in Shreveport, Louisiana.[8] He denied trafficking drugs and stated that he gave a false name because he had a warrant out of Kentucky for failing to report to his parole officer. He stated that the $39,000 that was taken from him was "lawfully [his,]" having been given to him by his mother right before she passed away.[9] Stevens stated that he concealed the money because he is from the country and "don't know much about the city" and he was "thinking that if somebody sees that [money] in the city, [he heard] [of] people getting hurt and killed all the time . . . [he] figure [sic] somebody would try to rob [him]." He used the money to buy and sell cars. He did not tell the police

---

[8]He had stated that he was going to see his mother in Arizona on the date of the seizure.

[9]Though Stevens refers to $39,000 having been taken from him, nowhere in the record does that figure appear; however, he stated that he was not claiming the police department stole $8,000. Furthermore, in his pro se answer, he asserted that the seized amount included "$31,711.00, plus the $1,484.00 that was in [his] pocket." Additionally, Stevens stated that he had obtained $55,000 from his mother in total and that it was money she had saved in cash in a wall in her trailer home because she "did not trust banks." He asserted that he did not put the money in a bank because of his warrant, which he asserted would not allow him to open a bank account. He had lived off the money for ten years, according to his testimony.

SLIP OPINION

where the money was because they were "going to keep it" and he would be going through a hearing "like this" if he told them. He planned to "wait and have somebody come down here and get [his] belongings out of impound and get [the money] out of the vehicle"; "why go through all this whenever [he] could just have somebody come pick [the money] up?" He did not think that plan was bold. He admitted that he had not "known [Scruggs] very long" and admitted that he had been convicted of felony possession of a controlled substance, manufacturing methamphetamine, and theft of identity in the last ten years.

Stevens's fiancée, whom he referred to as his wife, testified that she had known Stevens for about "two, three years" before he was arrested. She had no knowledge of him "ever trafficking in drugs." She stated that he was in possession of the money lawfully, having "found the money in [their] trailer when [they were] remodeling, but she went on to testify that the money was given to him "whenever his mother died" and that she thought it was "like inherited[.]"

Following the hearing, the circuit court entered an order forfeiting the money to appellee on July 28, 2016. Therein, it stated that

> [Stevens's] explanation for hiding money in concealed locations in the vehicle was not believable considering the amount of money he had on his person.
> . . . .
> [Stevens's] and his witness' explanation for the Thirty One Thousand Four Hundred Eighteen Dollars ($31,418.00) were different and unrealistic. [Stevens] stated that he inherited Fifty-Five Thousand Dollars ($55,000.00) from his mother some years ago. [Stevens's] witness, who was his fiancée, stated they found the money in the wall of [Stevens's] deceased mother's mobile home when they were remodeling.
> . . . .
> Also, [Stevens] never stated to the officers that he had money in the vehicle prior to the officers finding the money in different locations inside the vehicle. Also, the rental vehicle was leased to someone that was not present.
> . . . .

Because [Stevens's] charges were two misdemeanors, counsel argued the money was not forfeitable. However in accordance with Arkansas Code Annotated 5-64-505 there is a rebuttable presumption that money found in close proximity to a forfeitable controlled substance is presumed to be forfeitable under subdivision (a)(7). The Claimant did nor [sic] rebut this presumption by a preponderance of the evidence.

This timely appeal followed.

A forfeiture is an in-rem proceeding, independent of the criminal charge, to be decided by the circuit court by a preponderance of the evidence.[10] We will not set aside a circuit court's decision granting forfeiture unless it is clearly erroneous.[11] A circuit court's decision is clearly erroneous when, although there is evidence to support it, the appellate court, after reviewing the entire evidence, is left with a definite and firm conviction that a mistake has been committed.[12]

Under Arkansas law, for property to be subject to forfeiture, the State must prove by a preponderance of the evidence that the property was "used, or intended to be used" to facilitate a violation of the Uniform Controlled Substances Act.[13] If, however, the property is found in close proximity to a forfeitable controlled substance, then it is presumed to be forfeitable, and the burden of proof rests with the claimant of the property to rebut this presumption by a preponderance of the evidence.[14]

---

[10]*Salim v. State*, 2016 Ark. App. 556, at 8, 506 S.W.3d 863, 868 (citing *$15,956 In U.S. Currency v. State*, 366 Ark. 70, 233 S.W.3d 598 (2006)).

[11]*Id.*

[12]*Id.*

[13]*Salim*, 2016 Ark. App. 556, at 9, 506 S.W.3d at 869 (citing Ark. Code Ann. § 5-64-505(a)(6)).

[14]*Id.* (citing Ark. Code Ann. § 5-64-505(a)(7)).

Stevens argues for his first point on appeal that the circuit court erred in forfeiting the $31,418 because appellee failed to make a causal connection between the money hidden in the vehicle and drug trafficking or sales. Specifically, he argues that the officers' testimony was speculation—not evidence—and states that Stevens's testimony explained where he was going, where the money came from, and why he did not tell the officers that the money was in the car. Finally, he argues that he rejects that there was any "substantial connection" between the money and drugs because "the Arkansas statute is ambiguous and contradictory." To the extent this was an attempt to raise appellant's "ambiguous and contradictory" argument under this point, we do not reach the merits of the alleged ambiguity or contradictory nature of the statute because the above-referenced sentence is the entirety of his ambiguity-or-contradictory argument under this point. It is axiomatic that this court will not entertain an argument where there is no citation to authority or convincing legal argument.[15]

Where the standard of review is a preponderance of the evidence[16] and the entirety of Stevens's argument regarding appellee's alleged failure to prove a causal connection between the money and drug trafficking comes from the testimony of Stevens and his fiancée, this court cannot find that the circuit court erred. It appears that the circuit court found the appellee's witnesses more credible and simply did not believe appellant's contrary

---

[15]*Lewis v. State*, 2012 Ark. App. 184, at 5–6, 396 S.W.3d 775, 778 (citing *Mills v. State*, 351 Ark. 523, 529, 95 S.W.3d 796, 799 (2003)).

[16]*See $15,956 In U.S. Currency v. State*, 366 Ark. 70, 79, 233 S.W.3d 598, 604 (2006).

explanations. This court will set aside the trial court's findings only if they are clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.[17]

We do not address the merits of Stevens's second argument that Arkansas Code Annotated section 5-64-505 is ambiguous and contradictory and cannot support the seizure of property where the underlying crime is a misdemeanor possession of a controlled substance. Before the circuit court, while arguing that a misdemeanor cannot support a forfeiture, he never raised that argument that the statute itself was ambiguous or contradictory. A party cannot change the grounds for an objection or motion on appeal, but is bound by the scope of arguments made at trial.[18] Our supreme court has stated that the circuit court must have the benefit of the development of the law by the parties in order to rule adequately on the issues.[19] We will not address an issue that is fully developed for the first time on appeal.[20]

Affirmed.

HARRISON and VAUGHT, JJ., agree.

*Law Office of Kathryn L. Hudson*, by: *Kathryn L. Hudson*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Ashley Priest*, Ass't Att'y Gen., for appellee.

---

[17]*In re Three Pieces of Prop. Located in Monticello*, 81 Ark. App. 235, 241, 100 S.W.3d 76, 79 (2003) (citing Ark. R. Civ. P. 52(a); *In Re One 1994 Chevrolet Camaro*, 343 Ark. 751, 37 S.W.3d 613 (2001); *Reddin v. State*, 15 Ark. App. 399, 695 S.W.2d 394 (1985)).

[18]*Gooch v. State*, 2015 Ark. 227, at 7, 463 S.W.3d 296, 301 (citing *Smith v. State*, 354 Ark. 226, 242, 118 S.W.3d 542, 551 (2003)).

[19]*Id*. (citing *Talbert v. State*, 367 Ark. 262, 265, 239 S.W.3d 504, 508 (2006)).

[20]*Id*. at 8, 463 S.W.3d at 301 (citing *Raymond v. State*, 354 Ark. 157, 168, 118 S.W.3d 567, 574 (2003)).